UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
WULMER A.,

                      Plaintiff,

           -against-

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
------------------------------------------------------------------X

**OPINION AND ORDER**

25 Civ. 2394 (JCM)

      Plaintiff Wulmer A.[1] ("Plaintiff") commenced this action on March 21, 2025 pursuant to

42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the

"Commissioner"), which denied Plaintiff's application for Supplemental Security Income

("SSI") under the Social Security Act ("SSA"). (Docket No. 1).  Presently before the Court are

(1) Plaintiff's memorandum of law, (Docket No. 8) ("Motion" or "Pl. Br."); (2) the

Commissioner's opposition to Plaintiff's Motion, (Docket No. 10) ("Comm'r Br."); and (3)

Plaintiff's reply, (Docket No. 13).  For the reasons set forth herein, Plaintiff's Motion is denied.[2]

## I.  BACKGROUND

      Plaintiff was born on January 5, 1975. (R.[3] 32).  He applied for SSI on January 14, 2021,

---

[1] Plaintiff's name has been partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] The parties have consented to the undersigned for all purposes, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Docket No. 6).

[3] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on May 22, 2025. (Docket No. 7).  All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration.

alleging a disability onset date of October 25, 2017. (R. 25).[4]  Plaintiff's claim was initially

denied on June 27, 2022. (R. 25, 136-40).  He requested reconsideration on July 5, 2022, (R.

150-51), which was ultimately denied on October 21, 2022, (R. 152).  Plaintiff then filed a

written request for an administrative hearing to review the denial of his claim. (R. 25, 166).

Administrative Law Judge Mark Solomon ("ALJ Solomon" or the "ALJ") held a hearing on

August 1, 2023. (R. 25).  On August 29, 2023, ALJ Solomon issued a written decision finding

Plaintiff not disabled, and thus, not entitled to SSI. (R. 34).  Plaintiff requested review by the

Appeals Council, which was denied on January 16, 2025,[5] (R. 1), making the ALJ's decision ripe

for review.

## A.  Medical Evidence

## 1.  Dr. Jeffrey S. Kaplan, M.D.

Plaintiff received continuing treatment from Dr. Jeffrey S. Kaplan, M.D. following his

workplace accident in 2017.  Dr. Kaplan first treated Plaintiff on October 31, 2017. (R. 393, 629-

30).  He prepared a "Doctor's Initial Report" on Form C-4[6] in connection with Plaintiff's

---

[4] On October 25, 2017, Plaintiff was injured after he fell from an approximately five-foot ladder while working in construction. (R. 807).  He was brought to the emergency room at Bellevue Hospital. (R. 807-09).

[5] Plaintiff filed his request for review on May 28, 2024. (R. 16).  The request was not filed within 60 days of receiving notice of the ALJ's August 29, 2023 decision, as required by 20 C.F.R § 404.968(a). (*Id.*).  "The regulations provide that the Appeals Council may dismiss a request for review where the claimant has failed to file the request within the stated period of time and the time for filing has not been extended (20 CFR 404.971)." (*Id.*).  On August 23, 2024, the Appeals Council sent Plaintiff a notice granting him an opportunity to explain why he did not file within the 60-day time period. (*Id.*).  The Appeals Council did not receive a response to the notice and stated that the record did not contain an explanation. (*Id.*).  Accordingly, on October 7, 2024 the Appeals Counsel found there was no good cause to extend the time for filing and dismissed Plaintiff's request for review. (*Id.*).  However, on January 16, 2025, the Appeals Counsel said it had set aside its earlier action to consider additional information, but again denied Plaintiff's request for review. (R. 1).

[6] Form C-4 is used in workers' compensation benefit cases.  A physician must file their initial report to the Workers' Compensation Board within 48 hours of first rendering treatment to the patient. NEW YORK STATE, *Worker's Compensation Board Common Forms*, http://www.wcb.ny.gov/content/main/forms/AllForms.jsp (last visited March 10, 2026).  Form C-4.2 is used for the 15-day report after the first treatment, and to report each follow-up visit while treatment continues. *Id.*

application to the New York Worker's Compensation Board. (R. 393-97). Dr. Kaplan diagnosed Plaintiff with a left knee sprain and radiculopathy in his lumbar region. (R. 393). At his initial visit, Plaintiff reported pain and stiffness in his left knee and lower back, as well as weakness in his lower extremities; he felt his pain was worsening, had pain with motion, and had difficulty getting out of bed because of low back pain. (R. 394, 397). Dr. Kaplan performed an orthopedic evaluation along with a physical examination. (R. 395). He opined that Plaintiff was "100%" temporarily impaired, and ordered left knee and lumbar MRIs, physical therapy, and a back brace. (*Id.*).

After each visit, Dr. Kaplan prepared a "Progress Report" on Form C-4.2. Dr. Kaplan examined and treated Plaintiff again on November 1, 2017. (R. 387-89). Plaintiff's diagnosis was "lumbar radicular pain," and his reported symptoms included "pain, stiffness in lower back, ... [and] pain/weakness in [his] left knee." (R. 389). Dr. Kaplan observed "tenderness/tightness" in Plaintiff's "[paravertebral] thoracic-lumbar muscles," "spasm/tenderness [in his paravertebral] lumbar-sacral," and "greatly restricted" lumbar movement. (*Id.*). He stated that Plaintiff arrived "in a slightly bent over posture" and "ha[d] difficulty mounting [the] exercise table." (*Id.*). Dr. Kaplan observed "tenderness" in Plaintiff's left knee, as well as audible crepitus and decreased quad strength. (*Id.*). Dr. Kaplan stated that Plaintiff's functional deficits included "impaired mobility, motor function, muscle performance and [range of motion]." (*Id.*).

Dr. Kaplan treated Plaintiff throughout 2017 on the following dates: November 2, 2017, (R. 381-83), November 6, 2017, (R. 384-86), November 8, 2017, (R. 390-92), December 11, 2017, (R. 399-401), and December 28, 2017, (R. 625). Dr. Kaplan ordered MRIs of the left knee, lumbar spine, and cervical spine. The November 2, 2017 MRI of Plaintiff's left knee evidenced "a tear of the peripheral inferior articular surface of the posterior horn of the medial

meniscus," a "partial tear of the anterior cruciate ligament," "joint effusion," and a "1.2 centimeter popliteal cyst." (R. 424, 671, 791). An MRI of the lumbar spine taken on November 2, 2017 revealed "disc herniations at L3-4, L4-5, and L5-S1," and impingements on nerve roots. (R. 427, 672, 790).[7] The cervical spine MRI taken on November 17, 2017 revealed "disc herniations at C3-4 and C6-7 with central and foraminal narrowing." (R. 421, 670, 789).

Dr. Kaplan treated Plaintiff throughout 2018, including on January 3, 2018, (R. 418-20), January 5, 2018, (R. 415-17), January 9, 2018, (R. 412-14), January 29, 2018, (R. 430-32), February 13, 2018, (R. 621), March 5, 2018, (R. 447-49), March 6, 2018, (R. 444-46), March 12, 2018, (R. 441-43), and March 13, 2018, (R. 620). On March 13, 2018, Dr. Kaplan informed Plaintiff that he was authorized for left knee arthroscopy. (*Id.*). Plaintiff then saw Dr. Kaplan on April 6, 2018, (R. 461-63), April 12, 2018, (R. 458-60), and April 16, 2018, (R. 455-57). Each of Dr. Kaplan's "Progress Reports" from these appointments included similar information to that included in his Initial Report on Form C-4, as well as other symptoms Plaintiff experienced such as poor balance, (R. 449), intermittent sharp pain rated a five out of six, (R. 446), greatly restricted lumbar motion, (R. 460), and decreased quad strength, (R. 457).

Dr. Kaplan performed left knee surgery[8] on Plaintiff on April 18, 2018. (R. 641-42). He had his first post-operative visit with Dr. Kaplan on May 1, 2018. (R. 481-83, 614). Plaintiff saw Dr. Kaplan again on May 10, 2018, (R. 484-86), May 29, 2018, (R. 609), July 10, 2018, (R. 604), and September 4, 2018, (R. 600). Dr. Kaplan noted at the July 10, 2018 appointment that

---

[7] Specifically, the lumbar spine MRI report said: "the herniation at L5-S1 impinges upon the bilateral extra thecal S1 nerve roots as well as the existing right L5 nerve root. The herniation at L4-5 impinges upon the exiting right L4 nerve root." (R. 427).

[8] The procedures performed at the April 18, 2018 surgery included: (1) left knee arthroscopy with partial medial meniscectomy; (2) abrasion chondroplasty of medial femoral condyle; and (3) synovectomy in multiple compartments, major. (R. 641).

Plaintiff "ambulates with an antalgic gait and he has difficulty mounting the examination table because of knee pain." (R. 604).

Plaintiff continued to be treated by Dr. Kaplan in 2019, including on February 27, 2019, (R. 589), and April 10, 2019, (R. 586). At the April 10th appointment, Dr. Kaplan indicated four diagnoses: (1) sprain of unspecified site of left knee; (2) pain in left knee; (3) radiculopathy, lumbar region; and (4) low back pain. (R. 497). Dr. Kaplan opined that Plaintiff was still "100%" temporarily impaired. (R. 498). He also noted limited lumbar motion, post-traumatic arthritis in Plaintiff's left knee post-surgery, and recommended Plaintiff continue with pain management and spine surgery. (R. 499). Plaintiff subsequently saw Dr. Kaplan on April 11, 2019, (R. 500-02), May 22, 2019, (R. 582), July 15, 2019, (R. 519-21), and July 18, 2019, (R. 516-18). Throughout 2019, Plaintiff reported ongoing pain and weakness in his left knee. (*See, e.g.*, R. 518, 521).

Plaintiff continued being treated by Dr. Kaplan in 2020. He saw him on February 3, 2020, (R. 536-38), February 6, 2020, (R. 533-35), February 10, 2020, (R. 530-32), and February 13, 2020, (R. 527-29). At each of these appointments, Plaintiff's cervical motion was "greatly restricted" and he rated his pain as a five out of six. (R. 529, 532, 535, 538). Plaintiff saw Dr. Kaplan on August 19, 2020, (R. 545-47), August 31, 2020, (R. 542-44), and September 14, 2020, (R. 539-41), reporting similar symptoms and pain. He also visited Dr. Kaplan on November 10, 2021, complaining of ongoing left knee pain. (R. 560).

**2. Dr. Matthew P. Grimm, M.D.**

Plaintiff also received treatment from Dr. Matthew P. Grimm, M.D. following his workplace accident in 2017. Dr. Grimm first treated him on December 12, 2017, and prepared an "Initial Report" on Form C-4. (R. 402-08, 626-28). Dr. Grimm diagnosed Plaintiff with low

back pain and radiculopathy in his lumbar region. (R. 402).  At his initial visit with Dr. Grimm,

Plaintiff reported pain and stiffness in his cervical and lumbar regions. (R. 403).  He explained

that the pain "radiat[ed] down [his] left lower extremity with numbness" in the same area, and

rated his back pain at a ten out of ten at its worst. (R. 406).  Plaintiff also said that the pain

radiated into his "bilateral upper extremities" and he had related numbness. (*Id.*).  He rated his

neck pain at an eight out of ten. (*Id.*).  Dr. Grimm stated that Plaintiff had a spinal cord injury, as

well as cervical and lumbar pain/tenderness and palpable muscle spasms. (R. 403-04).  Dr.

Grimm also noted that Plaintiff had been undergoing treatment for his knee with Dr. Kaplan,

tried physical therapy, received an injection into the knee joint which temporarily helped, and

was considering surgery. (R. 406).  Like Dr. Kaplan, Dr. Grimm opined that Plaintiff was

"100%" temporarily impaired. (R. 404).  Dr. Grimm reviewed Plaintiff's lumbar and cervical

MRIs, which showed disc herniations with multi-level nerve root impingement, and

recommended additional "neurodiagnostic testing" to determine the extent of Plaintiff's

neuromuscular damage and possible injection therapy. (R. 408).  At his initial visit with Dr.

Grimm, Plaintiff received cervical and lumbar trigger point injections. (*Id.*).

    After each subsequent visit, Dr. Grimm prepared a "Progress Report" on Form C-4.2.

Dr. Grimm examined and treated Plaintiff throughout 2018.  At his January 24, 2018

appointment, Plaintiff again received cervical and lumbar trigger point injections. (R. 433-37,

622-24).  On February 6, 2018, Dr. Grimm found bilateral C6 and left S1 radiculopathies. (R.

662-68, 801-06).  Dr. Grimm also administered lumbar interlaminar epidural steroid injections

and epidurograms on Plaintiff on February 12, 2018, (R. 654-56), and April 2, 2018, (R. 464-69,

649-51).  Plaintiff received a cervical interlaminar epidural steroid injection and epidurograms

on February 26, 2018, (R. 450-54, 652-53), and April 10, 2018, (R. 615, 643-45).  At Plaintiff's

March 15, 2018 appointment, Dr. Grimm noted that Plaintiff showed "improved function as well as pain reduction [following his cervical epidural steroid injection], yet the pain symptoms in the upper extremities [were] not yet to a tolerable level." (R. 618). Dr. Grimm also recommended further lumbar epidural steroid injections because "conservative measures have failed." (*Id.*). On May 8, 2018, Plaintiff returned to Dr. Grimm and explained that following the epidurals, his left sided symptoms improved, but that he was now experiencing right sided radicular pain, with pain radiating into both upper extremities, and numbness in his neck. (R. 472-77). Dr. Grimm's report indicated that while Plaintiff had "shown both improved function as well as pain reduction, ... the pain symptoms in the lower [and upper] extremities [were] not yet to a tolerable level." (R. 476). At the May 8th appointment, Plaintiff also received lumbar and cervical epidural steroid injections. (R. 610-12). He received lumbar interlaminar epidural steroid injections and epidurograms on May 14, 2018, (R. 638-40), a cervical interlaminar epidural steroid injection and epidurogram on May 21, 2018, (R. 636-37), and lumbar trigger point injections on June 13, 2018, (R. 605-08), and August 7, 2018, (R. 601-03). Dr. Grimm also saw Plaintiff on October 9, 2018, (R. 597-99), and December 11, 2018, (R. 594-96).

In 2019, Plaintiff continued to be treated by Dr. Grimm. He saw Dr. Grimm on January 16, 2019, (R. 590-93), February 27, 2019, (R. 589), March 6, 2019, (R. 587-88), April 24, 2019, (R. 583-85), June 19, 2019, (R. 522-26, 579-81), and November 13, 2019, (R. 576-78). At his June 19th appointment, Plaintiff continued to report neck and back pain, and only "transient improvement" after his epidural shots. (R. 522-24). Dr. Grimm noted on June 19, 2019 that Dr. Weinstein recommended cervical spine surgery. (R. 524).

Plaintiff visited Dr. Grimm again on January 15, 2020, (R. 573-75), May 4, 2020, reporting his pain at a nine/ten out of ten, (R. 571-72), and June 30, 2020 to receive lumbar

trigger point injections. (R. 568-70).  Plaintiff also saw Dr. Grimm on January 27, 2021, (R. 552-57, 565-67), reporting ongoing post-surgical radiating pain, "very tight" neck muscles, and "severe headaches" that radiated towards his eyes, sometimes making them water, (R. 555).  During the January 27th visit, Plaintiff said he was still experiencing some spasms at night due to his cervical radicular pain. (R. 557).  He also received cervical trigger point injections and bilateral greater occipital nerve blocks at this appointment. (*Id.*).

On February 10, 2021, Dr. Grimm referred Plaintiff for a neuropsychological evaluation to clear Plaintiff for a proposed spinal cord stimulator procedure. (R. 549-51).  The report, prepared by Charles E. Robins, STD, PhD, stated that Plaintiff continues to report "severe pain ('9 out of 10')" after his 2017 accident, including after subsequent surgeries on his cervical spine, lumbar spine, and left knee. (R. 550).  The report diagnosed Plaintiff with "chronic pain due to trauma" and "pain-induced clinical depression," which was physical and not psychological. (R. 551).  Plaintiff saw Dr. Grimm again on May 24, 2021, and received bilateral sacroiliac joint injections and cervical trigger point injections. (R. 561-64).  Dr. Grimm noted that Plaintiff developed bilateral sacroiliitis due to the strain placed on his joints from an antalgic gait related to his injury. (R. 563).

From 2017 to 2021, Dr. Grimm prescribed several different medications to alleviate Plaintiff's cervical and lumbar radicular pain, and left knee pain, including amitriptyline HCl, diclofenac potassium, diclofenac sodium, cyclobenzaprine HCl, Tactinal Extra Strength, gabapentin, Robaxin, Norco, and nabumetone. (R. 673-81).[9]

---

[9] According to the administrative record, to manage Plaintiff's pain Dr. Grimm and Dr. Weinstein each prescribed gabapentin; and Dr. Grimm, Dr. Kaplan, and Dr. Weinstein each prescribed oxycodone. (R. 294).

During the August 1, 2023 administrative hearing, Plaintiff's counsel mentioned that Dr. Grimm prepared "an opinion with regards to [Plaintiff's] condition." (R. 43). ALJ Solomon said he never received the report, and counsel confirmed he would re-submit it following the hearing. (*Id.*). Plaintiff subsequently submitted a treating report from Dr. Grimm, dated May 18, 2023, (R. 867-70), which stated that he was "experiencing an increase in radicular symptoms nearly 5 years post surgically" and that he was "presently at a temporary impairment percentage of 100% from his prior occupation," (R. 869). Dr. Grimm's May 2023 report indicates that Plaintiff reported, among other symptoms, "an increase in lower back pain radiating into his right lower extremity," "pain to the left testicle [that] progressed to radiating into the right leg," "an increase in spasms," "[that] he has not been able to sleep due to the pain in the back radiating into the legs," and "that the pain ranges from a 5 to an 8 and when it is at an 8 he will have to stop whatever he is doing and wait for it to subside." (R. 867). Plaintiff also told Dr. Grimm that "he can walk for about 7-10 blocks before needing a break due to too severe of pain," that "sitting bothers him a great deal," that he "can only sit for 15-20 minutes then will need to offload his lower back," that he "cannot sit in a car for long distances," and that "lifting greater than a gallon of milk on a regular basis will exacerbate his pain." (*Id.*).

**3. Dr. Joseph Weinstein, D.O. and Dr. Carlos Castro, M.D.**

From 2018 to 2022, Plaintiff was also treated by Dr. Joseph Weinstein, D.O. and Dr. Carlos Castro, M.D. He saw Dr. Weinstein on June 20, 2018, (R. 727-28), July 18, 2018, (R. 724-26), August 29, 2018, (R. 721-23), and October 29, 2018, (R. 718-720). On October 30, 2018, Dr. Weinstein, assisted by Dr. Castro, performed spinal fusion surgery on Plaintiff. (R.

758-60).[10]  Plaintiff saw Dr. Weinstein thereafter on November 14, 2018, (R. 716-17), and December 12, 2018, (R. 714-15).

Plaintiff subsequently saw Dr. Weinstein on January 30, 2019, (R. 712-13), March 20, 2019, (R. 709-11), May 1, 2019, (R. 706-08), June 12, 2019, (R. 703-05), July 17, 2019, (R. 700-02), and July 31, 2019, (R. 697-99).  Dr. Weinstein diagnosed Plaintiff with cervical radiculopathy and stated that Plaintiff had "failed all nonsurgical treatments." (R. 378).  On August 27, 2019, Dr. Weinstein, assisted by Dr. Castro, performed neck surgery on Plaintiff. (R. 378-80, 761-63).[11]  The doctors found a disk herniation at the time of surgery. (*Id.*).  In Plaintiff's discharge note, Dr. Weinstein stated that Plaintiff had difficulty running errands alone and climbing stairs. (R. 372).  He also instructed Plaintiff not to engage in any strenuous activity, heaving lifting, driving, or return to work until cleared by a doctor. (*Id.*).  Plaintiff saw Dr. Weinstein again on September 11, 2019, (R. 695-96), and November 13, 2019, (R. 693-94).

Plaintiff continued treatment with Dr. Weinstein in 2020 and 2021, including on January 8, 2020, (R. 691-92), March 11, 2020, (R. 689-90), May 13, 2020, (R. 687-88), and October 18, 2021, (R. 685-86).  At each appointment with Dr. Weinstein from 2018 to 2021, Plaintiff rated his pain between either a six, seven, or eight out of ten, and Dr. Weinstein stated that Plaintiff was "100% temporarily disabled." (*See, e.g.*, R. 695-702).  On March 21, 2022, Plaintiff saw Dr. Castro and rated his pain as a seven out of ten. (R. 683-84).  At many of these visits, Dr. Weinstein referred Plaintiff for follow up X-rays or MRIs. (*See, e.g.*, R. 754-56, 764-88, 792-

---

[10] The operation included: (1) a posterior lumbar microsurgical decompressive laminectomy at L4-5 and L5, S1; (2) bilateral lateral fusion at L3-4, L4-5 and L5-S1; (3) placement of segmental spinal instrumentation at L3-S1 using titanium pedicular instrumentation system; (4) local bone graft, allograft, and bone morphogenic protein placement; and (5) intraoperative fluoroscopy. (R. 758).

[11] The operation included: (1) anterior cervical microsurgical decompression, C6-7; (2) anterior cervical fusion; (3) placement of intervertebral prothesis utilizing titan spine cage at C6-7; (4) placement of supplemental anterior segmental spinal compression and instrumentation at C6-7 utilizing anterior cervical plate and screws; (5) local bone graft and allograft placement; (6) intraoperative fluoroscopy; and (7) left anterior cervical exposure. (R. 378, 761).

800).  Dr. Weinstein also referred Plaintiff to physical therapy following his anterior cervical discectomy and lumbar fusion surgeries. (*See* R. 729, 732, 735, 745, 747, 757).

**4.  Dr. Manuel Paz, M.D.**

On June 7, 2022, Plaintiff had an internal medicine consultative examination with Dr. Manuel Paz, M.D. (R. 858).  Plaintiff complained of upper and lower back pain and left knee pain since his 2017 workplace accident. (*Id.*).  At the time of the examination, he was going to physical therapy twice a week, had two back surgeries, surgery on his left knee, and multiple injections. (*Id.*).  He reported that his back pain was intermittent, sharp, and radiated down to his legs, felt better with rest, and was worse when laying down. (*Id.*).  He rated his back pain as an eight out of ten. (*Id.*).  His said that his left knee pain was intermittent and sharp, felt worse when walking, and improved with medication. (*Id.*).  He rated his knee pain as a six out of ten. (*Id.*).  Plaintiff also reported a history of hypertension since 2007, with symptoms including chest pain and dyspnea on exertion. (*Id.*).  At the time of his evaluation, Plaintiff lived alone. (*Id.*).  He had a friend who assisted him with tasks such as cooking, cleaning, laundry, and shopping. (*Id.*).  However, Plaintiff could shower and dress himself. (*Id.*).  He enjoyed watching television, reading, and online social activities. (*Id.*).

On examination, Dr. Paz found that Plaintiff appeared to be in no acute distress. (R. 859).  He had "normal" gait, used no assistive devices, could walk on his heels and toes without difficulty, and could perform half of a full squat. (*Id.*).  He needed no help changing for the examination or getting on and off the examination table, and could rise from a chair without difficulty. (*Id.*).  The examination revealed no sensory deficits. (R. 860).  Plaintiff maintained full strength in his upper and lower extremities, as well as full grip strength in both hands. (*Id.*).  Plaintiff underwent an X-ray of his left knee, which demonstrated no evidence of acute fracture,

dislocation, or destructive bony lesion, and his joint spaces appeared well-maintained. (R. 862).

He also underwent an X-ray of his lumbosacral spine, which showed his post-surgical L3-S1

spinal fusion, no evidence of acute fracture or subluxation (joint dislocation), and the "height of

all vertebral bodies and of the remaining intervertebral disc spaces" appeared well maintained.

(R. 863).

Dr. Paz diagnosed Plaintiff with upper and lower back pain, left knee pain, and

hypertension. (R. 860).  He rated Plaintiff's prognosis as "fair." (R. 861).  He concluded that

Plaintiff had "moderate limitations for bending, lifting, carrying, prolonged standing, prolonged

sitting, prolonged walking, climbing stairs, kneeling, and crouching." (*Id.*).

**5.  Dr. A. Saeed, M.D. and Dr. S. Putcha, M.D.**

On June 23, 2022, Dr. A. Saeed, M.D. assessed Plaintiff's residual functional capacity

("RFC"). (R. 84-89).  He opined that Plaintiff could occasionally lift and carry 20 pounds, and

could frequently lift or carry 10 pounds. (R. 84).  Dr. Saeed found that Plaintiff could (1) stand or

walk with normal breaks for approximately six hours in an eight-hour workday, and (2) sit with

normal breaks for approximately six hours in an eight-hour workday. (*Id.*).  He also found

Plaintiff's ability to push and pull generally "unlimited, other than shown, for lifting and

carrying." (*Id.*).  Additionally, Dr. Saeed found that Plaintiff could occasionally climb ramps,

stairs, ladders, ropes, and scaffolds, as well as occasionally kneel, crouch, and crawl. (R. 85).

Plaintiff's ability to stoop (bend at the waist) and balance was unlimited. (*Id.*).  However, Dr.

Saeed explained that Plaintiff had postural limitations in all these activities due to a history of

neck and lower back surgery, and left knee surgery. (*Id.*).

Dr. Saeed determined that Plaintiff was not disabled, and that Plaintiff's physical

impairments would limit him to performing light work only, with certain exertional limitations.

(R. 88).  At the reconsideration level, Dr. S. Putcha, M.D. affirmed Dr. Saeed's decision. (R. 102).

## B.  Nonmedical Evidence

## 1.  Plaintiff's Testimony

During the August 1, 2023 hearing, Plaintiff was assisted by a Spanish interpreter, (R. 41[12]), and represented by counsel, (R. 42).  He stated that the highest level of education he completed was ninth grade, in his home country of Honduras. (R. 45-46).  Plaintiff testified that he was injured in an accident while working in 2017 and had not worked since that date. (R. 46-47).  He also confirmed that he previously settled a worker's compensation case. (R. 47).

Plaintiff testified that he had surgery for his back in 2018 and surgery for his neck in 2019. (*Id.*).  Plaintiff further testified that, at the time of the hearing, he takes medicine to sleep and is getting medications once a month for pain management. (*Id.*).  Plaintiff also stated he has problems bending, so he has trouble putting on his socks and shoes, and cannot do household chores such as laundry. (R. 48).  He said he is unable to go shopping by himself, and although he can travel alone via bus or subway, he uses a cane sometimes when his pain is very severe. (*Id.*).  Plaintiff said his pain is "often" very severe, and clarified that typically meant approximately every two weeks. (R. 49).  He testified that when he is not in pain, he can sit for an hour before needing to stand up and move around, but that when the pain is very severe, he needs to stand up and change positions every ten minutes. (*Id.*).  He also stated that even when not in severe pain, his feet get numb while sitting so he "[has] to stand up and do exercise." (*Id.*).  He testified that his hands also sometimes become numb. (R. 50).

---

[12] Plaintiff testified that he understood English "a little bit," but did not speak it fluently. (R. 46).

Plaintiff estimated that he could stand up for forty-five minutes to one hour when he was not feeling pain, and could lift around ten pounds at any time. (*Id.*).  He said he did not have any difficulties using his hands or fingers for activities such as zippering, buttoning, using a knife and fork, or holding a cup in his hand. (*Id.*).  He also stated he did not have difficulties using his arms for reaching overhead or directly in front of him. (*Id.*).  He testified that he saw Dr. Grimm in May 2023 because he had exaggerated, very severe pain in his right foot, and his fingers were also in pain and getting numb. (R. 51).  At that time, Dr. Grimm gave Plaintiff an injection in his back, medication, and recommended that he undergo further testing. (*Id.*).  Plaintiff also told Dr. Grimm that he had trouble sleeping because the pain woke him up every one-to-two hours. (R. 51-52).  Plaintiff testified that he felt his pain had become worse and more severe, and that it hurt for him to put his feet on the ground. (R. 52).

On a typical day, Plaintiff read, walked, and watched television; sometimes he picked his children up from school. (R. 50, 52).  However, he explained that walking aggravated his pain. (R. 52-53).  On an average day, he walked about five blocks and if he was not in a lot of pain, he would walk further. (R. 53).  He also testified that he has difficulty climbing stairs and could typically climb fifteen steps before feeling pain, and that his knee hurt "very bad[ly]." (*Id.*).

## 2.  Vocational Expert's Testimony

Vocational Expert Christina Boardman ("VE Boardman") testified at Plaintiff's hearing. (R. 25, 53).  The ALJ posed a hypothetical to VE Boardman, asking her to assume an individual of Plaintiff's age, education, and work experience, who was limited to light or sedentary work; who had the ability to sit for six hours and stand or walk for six hours for light work, but only two hours for sedentary work; who could lift or carry up to 20 pounds occasionally and 10 pounds frequently for light work, and 10 pounds occasionally and 5 pounds frequently for

sedentary work; and who could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 55).  VE Boardman testified that such an individual limited to light work could work as a Marker, 209.587-034, light exertion, with an SVP 2; Routing Clerk, 222.687-022, light exertion, with an SVP 2; or Office Helper, 239.567-010, light exertion, with an SVP 2. (*Id.*).  VE Boardman also testified that such an individual limited to sedentary work could work as a Document Preparer, 249.587-018, sedentary exertion, with an SVP 2; Information Clerk, 237.367-046, sedentary exertion with an SVP 2; Order Clerk, 209.567-014, sedentary exertion with an SVP 2; or Charge Account Clerk, 205.367-014, sedentary exertion, with an SVP 2. (R. 55-56).  VE Boardman confirmed that this testimony was consistent with the Dictionary of Occupational Titles. (R. 56-57).

VE Boardman further testified that an individual who was unable to sit, stand, or walk for at least a total of eight hours in an eight-hour workday, or who was off task for more than fifteen percent of the day outside of regularly scheduled breaks, or who required more than one unscheduled absence a month, would be ineligible for all work in the competitive market. (R. 56).  Plaintiff's representative did not question VE Boardman. (R. 57).

**C.  ALJ Solomon's Decision**

On August 29, 2023, ALJ Solomon denied Plaintiff's application.  He determined that Plaintiff had not been under a disability within the meaning of the SSA since October 25, 2017. (R. 33).  Applying the five-step procedure established by the Commissioner for evaluating disability claims, ALJ Solomon evaluated Plaintiff's claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); (R. 26-33).  At step one, he found that Plaintiff had not engaged in substantial gainful activity from October 25, 2017, the alleged disability onset date. (R. 27).  At step two, ALJ Solomon determined that Plaintiff had the following severe impairments: (1) status post

lumbar and cervical herniations and radiculopathy status post decompression surgery; and (2) left knee meniscal and ACL tears, status post surgery. (*Id.*).  He determined that these impairments significantly limited Plaintiff's ability to perform basic work activities. (*Id.*).  At step three, ALJ Solomon found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpt. P, App. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (R. 28).  Specifically, the ALJ considered the criteria for disorders of the skeletal spine resulting in compromise of a nerve root and abnormality of a major joint(s) in any extremity. (*Id.*).  He found that the evidence in the record "[did] not consistently document signs, symptoms, or laboratory findings indicating any impairment or combination of impairments severe enough to meet the criteria of any listed impairment," and that "[n]o treating, examining, or non-examining medical source [had] rendered an opinion" regarding the same. (*Id.*).

ALJ Solomon determined that Plaintiff had the RFC "to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b)." (*Id.*).  Specifically, he found that Plaintiff "[could] sit for six hours in an eight hour workday; stand/walk for six hours in an eight hour workday; lift/carry twenty pounds occasionally and ten pounds frequently; and occasionally climb, balance, stoop, kneel, crouch and crawl." (*Id.*).  He also determined that, while "there may have been some greater limits during early periods before [Plaintiff's] surgeries, ... [Plaintiff] is capable of performing sedentary work with the same non-exertional limits." (R. 32).

In arriving at the RFC, the ALJ examined all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in the record based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p. (R. 28).  He "also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20

CFR 404.1520c." (*Id.*).  ALJ Solomon followed a "two-step process." (*Id.*).  First to determine "whether there [was] an underlying medically determinable physical or mental impairment[] ... that could reasonably be expected to produce [Plaintiff's] pain or other symptoms"; and second, upon showing of such an impairment, to "evaluate the intensity, persistency, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] work-related activities." (*Id.*).  He additionally considered Plaintiff's statements regarding his physical symptoms, including (i) "that he could not lift anything too heavy or stand for too long"; (2) "that he could walk for twenty minutes before needing to stop and rest for twenty minutes"; (3) "that he could sit for ten minutes when the pain is very severe ... [and] for one hour when not in pain, but his feet get numb"; (4) "that he could stand for twenty-five minutes to an hour and lift about ten pounds"; (5) that "he is able to travel by himself, but cannot shop by himself"; and (6) that "he uses a cane when pain is very severe." (R. 28-29).  The ALJ concluded that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (R. 29).

ALJ Solomon summarized the medical evidence in the record that he reviewed. (R. 29-31).  He described Plaintiff's initial visit to the Bellevue Hospital Emergency Department on October 25, 2017, along with a follow up visit with Dr. Kaplan on October 31, 2017, and the results of Plaintiff's November 2, 2017 lumbar spine and left knee MRIs. (R. 29).  The ALJ then detailed Plaintiff's 2018 medical history, including left knee surgery on April 18, 2018,[13] a post-

---

[13] On April 18, 2018, Plaintiff underwent "left knee arthroscopy with partial medial meniscectomy; abrasion chondroplasty of the medial femoral condyle; and synovectomy in multiple compartments." (R. 29).

operative visit with Dr. Kaplan on May 29, 2018, an appointment with Dr. Weinstein on June 20, 2018, an appointment with Dr. Kaplan on September 4, 2018, an October 9, 2018 visit with Dr. Grimm, back surgery on October 30, 2018,[14] and another visit with Dr. Grimm on December 11, 2018. (R. 29-30).  ALJ Solomon then turned to Plaintiff's 2019 medical history, including an appointment with Dr. Grimm on June 19, 2019, neck surgery on August 27, 2019,[15] and September and November 2019 visits with Dr. Weinstein. (R. 30).  The ALJ also described Plaintiff's March 11, 2020 visit with Dr. Weinstein; January 2021 and May 2021 visits with Dr. Grimm; October 18, 2021 visit with Dr. Castro; and November 10, 2021 visit with Dr. Kaplan. (*Id.*).  Finally, ALJ Solomon detailed Plaintiff's March 21, 2022 visit with Dr. Castro and May 18, 2023 visit with Dr. Grimm. (R. 31).

ALJ Solomon also reviewed and weighed the opinion evidence in the record. (R. 31-32). He found Dr. Paz's report partially persuasive because although "[i]t use[d] vague terms," the opinion "is generally supported by Dr. Paz's examination findings including a normal gait and stance, full strength in the upper and lower extremities and no sensory deficits." (R. 31).  The ALJ also found that the report was "generally consistent with treatment records." (*Id.*).

ALJ Solomon found the state agency medical consultants persuasive. (*Id.*).  He noted that Dr. Saeed's opinion, affirmed by Dr. Putcha, was "supported by and consistent with objective findings throughout the medical evidence of record." (*Id.*).  Specifically, Dr. Saeed concluded that Plaintiff "could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight hour workday; sit about six hours in an eight hour

---

[14] On October 30, 2018, Plaintiff underwent "posterior lumbar decompression laminectomy and fusion surgery." (R. 30); *see supra* n.10.

[15] On August 27, 2019, Plaintiff underwent "anterior cervical decompression and fusion surgery at C6-7." (*Id.*); *see supra* n.11.

workday; and occasionally climb, kneel, crouch and crawl." (*Id.*). The ALJ stated that Plaintiff's treatment records "show few positive clinical findings, no stated restrictions on standing or walking after surgery, mostly normal upper and lower extremity strength, [and] no use of an assistance device." (*Id.*).

ALJ Solomon also found "multiple workers' compensation assessments indicating that [Plaintiff] was 100% disabled" to be unpersuasive. (R. 32). Specifically, he said these assessments were "conclusory and use[d] terminology not applicable to Social Security Administration disability cases." (*Id.*). For example, he noted that Dr. Grimm concluded at an examination on May 18, 2023 that Plaintiff "is temporarily impaired 100% from his prior occupation." (*Id.*). ALJ Solomon reiterated that this terminology "is not applicable to Social Security cases, and disability with respect to [Plaintiff's] prior occupation is not the standard for determining Social Security disability." (*Id.*). The ALJ also noted that the "[May][16] 18, 2023 [exam with Dr. Grimm] appears to be an exacerbation of [Plaintiff's] condition, as there are no documented limits for over a year after March 21, 2022 and there is no evidence that any such recent exacerbations would be expected to last for at least 12 months." (*Id.*).

At step four, the ALJ concluded that Plaintiff was unable to perform any past relevant work as a construction worker. (*Id.*). At step five, considering Plaintiff's age, which qualified him as a younger individual, his limited education, the transferability of job skills, his work experience, and RFC, the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (*Id.*). Thus, Plaintiff "has not been under a disability ... [since] October 25, 2017." (R. 33).

---

[16] ALJ Solomon's decision states March 18, 2023, but the Court understands he intended to refer to Plaintiff's May 2023 examination.

## II.  DISCUSSION

Plaintiff argues that ALJ Solomon's decision should be reversed and remanded for further administrative proceedings because (1) the ALJ failed to properly develop the record by not requesting a medical source statement from Plaintiff's treating providers; and (2) the evidence credited by the ALJ fails to support his RFC findings. (Pl. Br. at 2).  The Commissioner maintains that (1) because Plaintiff is not challenging the quantity or quality of the objective medical evidence and treatment notes concerning his impairments, his argument that "the record was incomplete without a medical source statement from a treating provider" is meritless; and (2) "the ALJ considered the medical records in order to assess a well-supported [RFC] finding." (Comm'r Br. at 6, 12).

### A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (*per curiam*) (quoting 42 U.S.C. § 423(d)(1)(A)).  The Social Security Administration ("Administration") has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (*per curiam*).

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review is "limited to determining whether the [Administration's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g). Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Put another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id.* (quoting *Consol. Edison*, 305 U.S. at 229). The substantial evidence standard is "very deferential" to the ALJ. *Brault*, 683 F.3d at 448. The Court does not substitute its judgment for the agency's "or 'determine *de novo* whether [the claimant] is disabled.'" *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of

- 21 -

the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*

On January 18, 2017, the Administration considerably revised its regulations for evaluating medical evidence.  The rules went into effect on March 27, 2017, and therefore, apply to the instant case.  Under the new regulations, the treating physician rule no longer applies. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Consequently, no special deference is given to the treating physician's opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, "[the Commissioner] will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  The updated regulations also define a "medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions ...." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  Thus, a medical opinion must discuss both a claimant's limitations and "what [the claimant] is still capable of doing" despite those limitations. *Michael H. v. Saul*, 5:20-CV-417 (MAD), 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021).  Relatedly, conclusory statements by a claimant's provider concerning issues reserved to the Commissioner – for instance, whether the claimant is disabled under the SSA – are "inherently neither valuable nor persuasive" and will not be analyzed by the ALJ. 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

**B.  The ALJ's Duty to Develop the Record**

As a threshold matter, the Court must be satisfied that the record is fully developed

before determining whether the Commissioner's decision is supported by substantial evidence. *See Smoker v. Saul*, 19-CV-1539 (AT)(JLC), 2020 WL 2212404, at *9 (S.D.N.Y. May 7, 2020) ("Whether the ALJ has satisfied this duty to develop the record is a threshold question."). "[I]n light of the 'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n ALJ, unlike a judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08 Civ. 1525 (LAP)(GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). "This duty is present even when a claimant is represented by counsel[.]" *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004) (summary order). "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence" is appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d. Cir. 1996)); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order).

Plaintiff argues that because the record does not contain a medical source statement from any of his treating physicians, ALJ Solomon failed his affirmative duty to make reasonable efforts to develop a complete and accurate medical record. (Pl. Br. at 18). The Commissioner asserts that "the record before the ALJ was adequately developed," and the ALJ is not required to seek out a medical source opinion from a treating source. (Comm'r Br. at 12, 18). Moreover, Plaintiff was given a clear opportunity at his hearing to address any concerns regarding the completeness of the medical record and the need for additional medical source opinions, but did not do so. (*Id.* at 17).

Here, the Court finds no obvious gaps in the record. The record consists of medical treatment records from 2017 to 2022, medical opinions from the consultative examiner, records from the disability examiner, and the hearing records. *See supra* Sections I.A and I.B. At the 2023 hearing, ALJ Solomon stated that the last record he had from Plaintiff's doctors was from March 2022, and counsel raised the issue of one additional report by Dr. Grimm, dated May 18, 2023. (R. 42-43). The ALJ said the report was not in Plaintiff's file and instructed counsel to resubmit it after the hearing. (R. 43). At the end of the hearing, counsel confirmed that Dr. Grimm's report was the only missing document and said he would re-send it to the ALJ right away. (R. 58). Dr. Grimm's report was eventually submitted and the ALJ included it in his opinion. (R. 31-32). Therefore, the record is complete. *See Jordan v. Comm'r of Soc. Sec.*, 142 F. App'x 542, 543 (2d Cir. 2005) (summary order) (finding that the ALJ fulfilled his duty to develop the record where the ALJ kept the record open to permit counsel to obtain additional records, counsel wrote the ALJ that he had "nothing further to add" to the record, and counsel did not request the ALJ's help in obtaining additional documents).

While Plaintiff asserts that the ALJ failed to develop the record because he did not seek additional medical source statements from his treating providers, (Pl. Br. at 18-20), this is the first time Plaintiff raises this argument or any issue with the completeness of the record. Further, Plaintiff cites to no case law requiring the ALJ to request a medical source statement from a treating physician, but rather only refers to SSA regulations advising that the ALJ must make "[e]very reasonable effort" to develop the record. 20 C.F.R. § 404.1512(b)(i); (Pl. Br. at 19). However, "[t]he ALJ's obligation to assist the claimant in assembling [his] medical records, although robust, 'is not unlimited.'" *Fletcher v. Comm'r of Soc. Sec.*, 22-CV-2873 (ER)(BCM), 2023 U.S. Dist. LEXIS 170780, at *32 (S.D.N.Y. Sept. 22, 2023), *report and recommendation*

*adopted*, 2023 U.S. Dist. LEXIS 186550 (S.D.N.Y. Oct. 16, 2023), (quoting *Martin v. Saul*, 18-CV-1478 (HKS), 2020 WL 5096057, at *4 (W.D.N.Y. Aug. 28, 2020)). "An ALJ is not required to obtain a medical opinion when, as here, such an opinion is not part of 'the records of [the claimant's] medical sources(s).'" *Ramos v. Comm'r of Soc. Sec.*, 24-2420, 2025 WL 1720393, at *1 (2d Cir. June 20, 2025) (summary order) (alteration in original) (quoting 20 C.F.R. § 404.1512(b)(1)(ii)). Moreover, there was no clear evidentiary gap in the records, nor did Plaintiff's counsel request assistance to obtain missing records. *See Jordan*, 142 F. App'x at 543.

Furthermore, as Plaintiff was represented by counsel, "the ALJ may satisfy the duty to develop the record by relying on the claimant's counsel to obtain additional medical documentation." *Ballantyne T. v. Comm'r of Soc. Sec.*, 23-CV-11182 (HJR), 2025 WL 551820, at *8 (S.D.N.Y. Feb. 19, 2025) (quoting *Myers ex rel. C.N. v. Astrue*, 993 F. Supp. 2d 156, 163 (N.D.N.Y. 2012)); *see also Martin*, 2020 WL 5096057, at *4 (in a counseled case, the ALJ satisfied her duty "by holding the record open after the hearing to permit the submission of additional evidence."); *Jordan*, 142 F. App'x at 543 (same). In fact, Plaintiff's counsel obtained additional medical evidence and submitted it for review.

Accordingly, the Court finds that ALJ Solomon fulfilled his duty to develop the record.

## C. The ALJ's Residual Functional Capacity Determination

The ALJ determined that Plaintiff had the RFC to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b). (R. 28). He concluded that Plaintiff's ability to perform all or substantially all the requirements of light work was "impeded by additional limitations," but found jobs existed in significant numbers in the national economy for an individual of comparable age, education, work experience, and RFC. (R. 33). ALJ Solomon also concluded that while there may have been greater limits on Plaintiff's work abilities before his

surgeries, he was "capable of performing sedentary work with the same non-exertional limits." (R. 32). This includes work as a marker, routing clerk, officer helper, document preparer, information clerk, order clerk, or charge account clerk. (R. 33).

Plaintiff argues that ALJ Solomon erred in his RFC assessment by failing to explain how Dr. Paz's conclusion that Plaintiff had "moderate limitations for bending, lifting, carrying, prolonged standing, prolonged sitting, prolonged walking, climbing stairs, kneeling, and crouching," (R. 31), is "consistent with the demands of light or sedentary work," (Pl. Br. at 20). Plaintiff further contends that he "cannot meet the considerable standing and walking demands of light work if he is 'moderately' limited for prolonged standing and prolonged walking as found by Dr. Paz." (*Id.* at 21). The Commissioner maintains that there is "no inconsistency between Dr. Paz's medical source statement and the administrative decision's RFC finding that Plaintiff could perform a range of light [or sedentary] work with additional limitations" because "[c]ourt[s] have consistently found that moderate physical limitations are consistent with physical exertion at or above the sedentary level." (Comm'r Br. at 19-20).

The Court "conduct[s] a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citation omitted). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the Commissioner." *Id.* The ALJ must weigh all of the available evidence to make an RFC determination that is consistent with the record. *See Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 225 (E.D.N.Y. 2021) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order)).

"The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by his impairments." *Selian*, 708 F.3d at 418 (citing 20 C.F.R. § 404.1545). "The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 640 (S.D.N.Y. 2019) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)); *see also Weather v. Astrue*, 32 F. Supp. 3d 363, 376 (N.D.N.Y. 2012) (When determining the RFC, the ALJ considers "a claimant's physical abilities, mental abilities, [and] symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis.") (citing 20 C.F.R. § 404.1545(a)). "[T]he RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence." *Glessing v. Comm'r of Soc. Sec.*, No. 13 Civ. 1254 (BMC), 2014 WL 1599944, at *8 (E.D.N.Y. Apr. 21, 2014) (quoting *Wichelns v. Comm'r of Soc. Sec.*, No. 5:12-CV-1595 (NAM)(ATB), 2014 WL 1311564, at *6 (N.D.N.Y. Mar. 31, 2014)) (internal quotations omitted). The RFC determination is reserved to the Commissioner. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) (summary order). When the RFC is supported by substantial evidence in the record, the Court will uphold it. *Zacharopoulos*, 516 F. Supp. 3d at 226 (citing *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015)).

ALJ Solomon thoroughly considered the entire record in determining Plaintiff's RFC. He reviewed multiple workers' compensation assessments indicating that Plaintiff was 100% disabled, but found them unpersuasive because they were conclusory, used terminology not applicable to disability cases, and indicated Plaintiff's disability was temporary. (R. 32). Further,

while the workers' compensation assessments stated Plaintiff was "temporarily impaired 100% from his prior occupation," the ALJ noted that "disability with respect to [Plaintiff's] prior occupation is not the standard for determining Social Security disability." (*Id.*).

Additionally, the ALJ properly relied on state agency opinion evidence that Plaintiff's physical symptoms would not preclude him from light or sedentary work with limitations. *See Barber v. Comm'r of Soc. Sec.*, 6:15-CV-0338 (GTS)(WBC), 2016 WL 4411337, at *7 (N.D.N.Y. July 22, 2016) ("It is well established that an ALJ may rely on the medical opinions provided by State agency consultants and that those opinion[s] may constitute substantial evidence."); *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (finding that the ALJ appropriately relied on state agency physician's opinion because it was "most consistent with the record as a whole"); *Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight [and relied upon by the ALJ] if supported by medical evidence in the record."); *Rusin v. Berryhill*, 726 F. App'x 837, 840 (2d Cir. 2018) (finding that the ALJ's RFC assessment was "consistent" with state agency psychologist's review of record); *Perry v. Berryhill*, 711 F. App'x 9, 10 (2d Cir. 2017) (finding the ALJ "properly afforded significant weight to the opinion of [the State agency consultant]" because "his assessment was consistent with much of the evidence in the record.").

In making his RFC determination, ALJ Solomon assessed the opinion evidence and explained which opinions he found were more consistent with the record as a whole.  The ALJ found Dr. Paz's opinion, which determined that Plaintiff had moderate limitations in bending, lifting, carrying, prolonged standing, prolonged sitting, prolonged walking, climbing stairs, kneeling, and crouching, (R. 861), partially persuasive, (R. 31).  Although Dr. Paz's opinion used

"vague terms," it was supported by his examination findings and consistent with treatment records showing improvements with treatment. (*Id.*).  The ALJ found the opinions of Dr. Saeed and Dr. Putcha most persuasive. (R. 31-32).  Dr. Saeed concluded that Plaintiff could (1) stand or walk with normal breaks for approximately six hours in an eight-hour workday, and (2) sit with normal breaks for approximately six hours in an eight-hour workday. (R. 84).  Dr. Saeed also determined that Plaintiff's physical impairments due to a history of neck, lower back, and knee surgery would limit him to the light exertional level with only occasional climbing, kneeling, crouching, and crawling. (R. 85, 88).  Dr. Putcha affirmed Dr. Saeed's findings. (R. 102).  ALJ Solomon found that the limitations identified by Dr. Saeed and Dr. Putcha were consistent with and well supported by the record. (R. 31).  Therefore, the ALJ's reliance on state agency opinion evidence in support of his RFC finding was not in error.

Plaintiff argues that because Dr. Paz found he has "moderate limitations" in prolonged sitting and standing, (R. 861), he cannot meet the "sitting demands of sedentary work," (Pl. Br. at 21).  However, Plaintiff "cites no authority that suggests moderate limitations are inconsistent with either sedentary or light work." (Comm'r Br. at 20).  Indeed, Courts in this District have "found that moderate physical limitations are consistent with physical exertion at or above the sedentary level." (*Id.* at 19-20); *see also Claudene M. v. Comm'r of Soc. Sec.*, 1:24-CV-07185 (GRJ), 2025 WL 1736588, at *5 (S.D.N.Y. June 23, 2025) ("[A] number of courts have found that 'moderate' limitations for standing, walking, sitting, and lifting are consistent with the ability to do light work.") (quoting *Jordan v. Comm'r of Soc. Sec.*, 16-cv-9634 (KHP), 2018 WL 1388527, at *10 (S.D.N.Y. Mar. 19, 2018)) (internal quotations omitted); *Guzman v. Comm'r of Soc. Sec.*, 21-CV-6538 (KHP), 2022 WL 3013108, at *6 (S.D.N.Y. July 29, 2022) ("[The consultative examiner's] opinion that Plaintiff had only moderate limitations in reaching,

standing, walking, bending, lifting and climbing stairs is consistent with an RFC that Plaintiff can perform sedentary work" and "such moderate limitations are generally consistent with the even less restrictive RFC of light work."); *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 345-46 (S.D.N.Y. 2020) (The ALJ's assessment that plaintiff could perform light work "under a number of additional limitations ... is entirely in line with [the consultative examiner's] conclusion that ... [plaintiff] had mild to moderate limitations for prolonged walking and climbing stairs.") (internal quotations and citations removed).  Moreover, Dr. Paz's report supports the ALJ's RFC.  Dr. Paz noted that Plaintiff was in no acute distress, could walk on heels and toes without difficulty, and needed no help rising from a chair, or getting on and off an exam table. (R. 859).  He had a normal gait, full (5/5) strength in upper and lower extremities, intact dexterity, and full (5/5) grip strength. (R. 859-60).  Nothing in Dr. Paz's report suggests an inability to perform light or sedentary work with additional limitations.

Finally, the Commissioner asserts that while Plaintiff "generally contends that he is unable to meet the demands of light or sedentary work ... [he] cites no evidence in support of this claim." (Comm'r Br. at 22).  Thus, he has "failed to carry his burden to establish a more restrictive RFC." (*Id.*).  Plaintiff contends that he "cannot meet the sitting demands of sedentary work if 'moderately' limited for prolonged sitting as noted by Dr. Paz" because a "moderate limitation de[n]otes a more than minimal sitting limitation which is at odds with the considerable sitting demands of sedentary work." (Pl. Br. at 21).  This conclusory assertion is not supported by the evidence in the record, nor by case law.  In fact, ALJ Solomon concluded that Plaintiff's "ability to perform all or substantially all of the requirements of [a light or sedentary] level of work has been impeded by additional limitations," but found that Plaintiff could still perform the requirements of certain representative occupations based on the Vocational Expert's testimony

that jobs exist in the national economy for individuals such as Plaintiff. (R. 33). Moreover, Plaintiff has not pointed to any evidence the ALJ overlooked. He simply disagrees with the ALJ's conclusion. It is the ALJ's role to "weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," which the ALJ has done. *Matta*, 508 F. App'x at 56. Plaintiff has the burden to show that no reasonable factfinder could have reached the ALJ's conclusion based on the evidence in the record. *See Brault*, 683 F.3d at 448. Plaintiff has not made such a showing here.

Accordingly, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion is denied. The Clerk of Court is respectfully requested to close the case.

Dated: March 10, 2026
      White Plains, New York

**SO ORDERED:**

*Judith C. McCarthy*

JUDITH C. McCARTHY
United States Magistrate Judge

- 31 -